# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| **KAZI FOODS OF MICHIGAN, INC.,** | ) | Case No. 11-43971 |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Thomas J. Tucker |
| | ) | |

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| **KAZI FOODS OF FLORIDA, INC.,** | ) | Case No. 11-43986 |
| | ) | |
| Debtor. | ) | |
| | ) | Judge Steven W. Rhodes |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE GE ENTITIES'
MOTION TO CONDITION THE DEBTORS' USE, SALE OR LEASE OF
COLLATERAL AND PROCEEDS IN THE ABSENCE OF ANY ADEQUATE
PROTECTION OF THE GE ENTITIES' PERFECTED SECURITY INTERESTS**

David A. Lerner
**PLUNKETT COONEY**
38505 Woodward Ave., Suite 2000
Bloomfield Hills, MI 48304
Telephone: (248) 901-4000
Facsimile: (248) 901-4040

-and-

Alexander Terras
**REED SMITH LLP**
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
*Attorneys for General Electric Capital Corporation and
Colonial Pacific Leasing Corporation*

General Electric Capital Corporation ("GE Capital") and Colonial Pacific Leasing Corporation ("Colonial" and, collectively with GE Capital and their affiliates "GE"), hereby submit, pursuant to Section 363(e) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), this memorandum in support of their motion for the entry of an order conditioning and/or prohibiting Kazi Foods of Michigan, Inc. ("Kazi Michigan") and Kazi Foods of Florida, Inc. ("Kazi Florida" and, together with Kazi Michigan, the "Debtors") from using, selling, and/or leasing any collateral in which GE has a security interests absent adequate protection of GE's interests. In support thereof, GE state as follows:

## I. FACTUAL BACKGROUND

Over the past fourteen months, the Debtors – under the direction and control of one of their shareholders, Zubair Kazi – and together with several other affiliates, have engaged in an orchestrated scheme to: (i) avoid making payments to GE on their senior secured debt; and (ii) sequester and hide accurate and complete financial information related to the Debtors' business operations to disguise substantial improper transfers from the Debtor to Zubair Kazi and/or other entities owned and controlled by him. The Debtors' conduct has not only deprived GE of *any* payment on its secured debt over the past fourteen months, it also threatens GE's existing collateral base and improperly impairs its security interests and mortgage liens on the Debtors' assets.[1]

To add insult to injury, even a cursory reading of the motions already filed by the Debtors in this case, including, but not limited to, the First Day Joint Motion for (i) Expedited Relief and (ii) Interim and Final Orders (a) Authorizing Debtors' Use of Unencumbered Cash or, in the

---

[1] The facts set forth herein are intended to provide this Court with an introduction to the Debtors' historical conduct and their efforts to undermine the interests of GE, while continuing to make unauthorized and improper payments to their equity holders and affiliates. All of the facts set forth herein will supported by competent evidence at an evidentiary hearing on this Motion.

Alternative, Cash Collateral and (b) Granting Adequate Protection [Docket No. 5] (the "Cash Collateral Motion") demonstrate that the Debtors intend to persist in this improper conduct post-petition, albeit now with the request that this Court condone and/or authorize the same. Indeed, the Debtors' management continues its improper practices with respect to non-debtor affiliates, Kazi Foods of New York, Inc. (56 restaurants) and Kazi Foods of Annapolis, Inc. (12 restaurants). There is no doubt that these Debtors are incapable of adequately protecting GE's interests in their collateral without Court intervention. Further, their well-documented and consistent pattern of ignoring court orders in recent history makes even the promise of court oversight a imperfect solution and places GE – and its properly perfected senior secured lien on substantially all the Debtors' assets – at significant risk.

### A. The Debtors' Vanishing Asset Pool and Improper Transfers to Insiders and Affiliates

As detailed more fully in the Memorandum of Law in Support of the Motion of General Electric Capital Corporation and Colonial Pacific Leasing Corporation to Appoint Chapter 11 Trustee or Examiner (the "Trustee Memorandum"), the Debtors have systematically failed to make any payments to GE on account their secured debt for at least the prior fourteen months. Nor is this so because the Debtors financial circumstances have rendered them unable to pay GE. To the contrary, for the fiscal year ending in December 2010, the enterprise of which the Debtors are a part, and which is indebted to GE, reported earnings before interest, taxes, depreciation and amortization ("EBITDA") of more than $8 million. Of this amount, roughly $3 million may have been paid to KFC Corporation in past due royalties, leaving at least $5 million unaccounted for. At the same time, there is no indication in the papers filed with this Court where that $5 million may be located, or what entity might hold it.

This does not mean, however, that the Debtors are generally failing to pay their debts when due. Each of the Debtors - as well as the whole enterprise - has positive EBITDA

implying that trade debt and operating expenses are being paid currently. If the Debtors, in fact, also have past due payables, the amount of money unaccounted for becomes even larger. In fact, the Debtors have continued to make substantial payments to their affiliate Kazi Management VI, LLC ("KMVI") – an entity also owned and controlled by Zubair Kazi – despite the existence of binding subordination agreements which prohibit both the Debtors' remittance, and KMVI's acceptance, of fees to KMVI following defaults under the Debtors' loan agreements with GE.[2] Indeed, even following the filing of these chapter 11 cases, the Debtors' cash collateral motion seeks authority to make payments to KMVI in excess of $300,000 from February 17, 2011 (the "Petition Date") through March 31, 2011, which payments represent 5% of the Debtors' total sales.

These "management fees" paid to KMVI are grossly in excess of which might be considered appropriate within the rational business judgment of a similarly situated restaurant operator. The industry-wide standard for fast food restaurants dictates that approximately 4.0% - 4.5% of the restaurant's gross sales should be directed to pay corporate overhead expenses. In the budgets proposed by the Debtors, even before the "management fees" are taken into account, the Debtors have designated amounts almost equal to these standard expenditures to corporate overhead. This fact, when viewed together with the fact that the Debtors were contractually obligated to suspend these management fees fourteen months ago, makes clear that the payments to KMVI are improper payments for the benefit of Zubair Kazi and/or non-debtor, non-borrower

---

[2] On August 25, 2004, Kazi Florida and KMVI executed a Subordination Agreement providing that, upon the occurrence of an Event of Default under Kazi Florida's agreements with Colonial, no payment shall be made by or on behalf of Kazi Florida, and KMVI shall not take or receive from Kazi Florida payment, unless and until Kazi Florida's obligations to Colonial were satisfied in full. Similarly, Kazi Michigan and KMVI executed a Subordination Agreement on December 18, 2006, which also prohibited payments from Kazi Michigan to KMVI until Kazi Michigan's debts to ny of the

- 4 -

11-43971-tjt    Doc 35-2    Filed 02/21/11    Entered 02/21/11 17:24:45    Page 4 of 18

affiliates.[3] By permitting them to continue, this Court would be condoning payments to an affiliate of the Debtors which Debtors are contractually prohibited from making, and which KMVI is contractually prohibited from receiving.

At the same time that the Debtors' have been making these contractually prohibited payments to KMVI, the Debtors have also made substantial transfers to affiliates and/or insiders. Indeed, although the Debtors have not yet filed their statements of financial affairs, GE is informed and believes that the Debtors have historically engaged in substantial comingling of funds and assets with non-debtor affiliates without regard for corporate formalities or separate identities. This understanding, at a minimum, casts doubt on the First Day Motion of Debtors for an Order Authorizing the Continued Use of Their Prepetition Cash Management Systems, Bank Accounts and Business Forms [Docket No. 10] (the "Cash Management Motion"). Indeed, the Cash Management Motion is remarkably vague about the mechanisms the Debtors employ to manage their cash and accounting, and any representation that the Debtors will refrain from comingling their assets with the assets of other affiliates and/or insiders is suspiciously absent from the Cash Management Motion.

More importantly, however, the Debtors' historical pattern and practice of comingling of assets and improper transfers makes it impossible for the Debtors' to adequately protect GE's security interests unless: (i) protective language prohibiting such conduct is expressly included in any order granting the Cash Management Motion, and (ii) an independent third party is permitted full access to the Debtors' books and records in order to monitor the Debtors' conduct. With respect to the First Day Motions, no amount should be allowed for payments of "management

---

[3] Even assuming KMVI performs some useful service on the Debtors' behalf, pursuant to the express terms of the Subordination Agreements, KMVI is obligated to continue to perform these services for free. KMVI was aware of the risk of nonpayment of the management fees when the Subordination Agreements were executed, and contractually agreed to bear the burden of that risk. There is no provision of the Bankruptcy Code or otherwise that excuses them from that obligation.

fees" and all further interim and final use of cash collateral should be conditioned upon: (i) the appointment of a trustee; or (ii) at the very least, the Debtor's engagement of a fully empowered Chief Restructuring Officer (as indeed the Debtors have advised GE they propose to do).

### B. The Debtors' Failure to Protect the Goodwill of Their Business Operations

In the instant case, GE has a blanket lien on the Debtors' assets. As such, GE is entitled to adequate protection of its interests in the Debtors' tangible assets, and is also entitled to adequate protection of its secured interests in Debtors' intangible assets (including, but not limited to, goodwill, human capital related to assets, such as an assembled in-place workforce, skilled and key employees, the going concern value of the Debtors' business operations, the existence of excess economic income, and the existing customer and supplier base). The Debtors' conduct, directed by Zubair Kazi and orchestrated by the Debtors' chief financial officer, Stephen Poludniak – a former attorney with no apparent financial or accounting training who, as evidenced by the primitive budget attached to the Cash Collateral Motion rife with misspellings and other errors, appears to wholly lack any financial management skills or experience – have, through their conduct, continually placed the enterprise value of the Debtors' business at risk. Indeed, as demonstrated by the cash collateral budgets, both Debtors have positive EBITDA. This mandates that their vendors and suppliers have been paid currently along with all other ordinary course obligations (labor, rent, utilities, etc.). Consequently, the body of the Debtors' unsecured creditors should be limited to those creditors owed sums merely because the Debtors' normal payment practices were hindered by the filing of their bankruptcy petitions. Had the petitions not been filed, regular payments would have continued, making the filings disadvantageous to all creditors and impairing vendor relationships – an element of goodwill – not for the benefit of the Debtors, but rather for the purpose of further making improper and unauthorized payments to KMVI. The filing of these bankruptcy cases was not –

as the Debtors suggest – to protect their creditors, but was rather to continue their scheme not to pay GE the positive cash flow the Debtors and their non-debtor affiliates pledged to GE.

> C. **The Debtors' Naïve and Shortsighted Adherence to the KFC Brand Jeopardizes the Long Term Viability of the Debtors' Business Operations**

In the Debtors' first day motions, the Debtors' attempt to paint a rosy picture of future success and financial stability based upon their continued existence as KFC restaurants. This narrative, however, fails to acknowledge that the Debtors' rights under their Kentucky Fried Chicken Franchise Agreements (collectively, the "Franchise Agreements") were terminated over a year ago pursuant to a Notice of Termination served upon the Debtors on or about December 14, 2009. As such, the Debtors' continued existence as KFC restaurant operators is tenuous at best and the Debtors' representations to the contrary are misleading.[4]

Further, even had the Debtors' Franchise Agreements not been terminated, the continued viability of KFC restaurants over the long term is dubious. Pursuant to the 3rd Quarter 2010 Restaurant Industry Commentary published by Trinity Capital, KFC's same store sales were down 8.0% for the third quarter of 2010 (compared to an average of a 1.0% increase for all chicken quick service restaurants surveyed). This decline represented the worst decrease in sales for all the 21 major brand quick service restaurants tracked by Trinity.

In fact, KFC's same store sales have decreased steadily since late 2008. The KFC brand is a deadweight to the Debtors' financial success, and not the buoyant float they portray it to be. It likely has no long term viability, yet the Debtors – steered by Zubair Kazi, the direct or indirect operator of likely more KFCs nationwide than any other person – have no choice but to continue the status quo. Despite the clear writing on the wall, the Debtors have demonstrated

---

[4] Notably, the factual background set forth in the Debtors' first day motions never mention the termination of the Franchise Agreements, and appear to ignore it completely as if it has no bearing on their continued business operations.

that they are both unwilling and/or unable to pursue other more profitable branding opportunities. Faced with an opportunity to explore more stable options, the Debtors have instead opted to "double down" on their opportunity with KFC and, in doing so, have subjected GE to the substantial risk of funding a business enterprise that has no long term viability.

The Debtor's loyalty to the KFC brand – even in light of their terminated Franchise Agreements – demonstrates the continuing incompetence of present management in failing to plan for future risks in reaction to market conditions.

### D. Only Payment Adequately Protects GE

Throughout fourteen months of dilatory and frivolous litigation, Zubair Kazi's enterprises have managed to pay GE nothing, depriving GE of at least $6 million in irreplaceable cash flow, the very cash flow securing the loans. At every stage, the Debtors and their affiliates have fought vigorously to conceal their financial records from GE and to otherwise thwart GE' efforts to enforce its legal rights and remedies. At the same time, the Debtors have continued to make unauthorized and improper transfers to their insiders and affiliates in direct contravention of GE's security interests.

Most recently, on February 16, 2011, Colonial exercised its rights under Florida law and Uniform Commercial Code § 9-609 to have the Sheriffs of Miami-Dade and Broward County, Florida, tag and render unusable certain items of personal property that served as collateral for Kazi Florida's obligations to Colonial.[5] Following the filing of the bankruptcy petition, however, and without any court authorization or relief from the Writ of Replevin issued against it, Kazi Florida removed these Sheriff-placed tags and began using the collateral again.

---

[5] In assisting the Sheriffs' with that repossession, Colonial was informed by employees of the Debtors that the Debtors had removed portions of Colonial's collateral from certain of the Florida restaurant locations after entry, but prior to execution,of the Writ of Replevin, and that the Debtors and/or their insiders or affiliates were sequestering this property in contravention of Colonials' security interests therein.

Similarly, Kazi Florida entirely ignored the entry of an order appointing a receiver over its real and personal property in Broward County, Florida and made no mention of this order in its representations to the Court made in its first day motions.

When viewed in this light, it is clear that the Debtors are not innocent victims of an unfortunate recession, but are, instead, pawns in a far-reaching scheme masterminded by Zubair Kazi to systematically deprive GE of the benefit of its bargain with his enterprise, while at the same time looting the Debtors assets by diverting funds to the Debtors' offshore affiliates and insiders, including KMVI.

Indeed, despite GE's status as one of the largest franchise lenders in the United States, it has never: (i) encountered a borrower that failed to make any payments for over fourteen months despite the existence of adequate funds to make such payments, or (ii) been forced to seize open restaurants (as Colonial did on February 16, 2011). Debtors and their affiliates are, without question, in a class of their own. Regardless of whether outright fraud has occurred (including, but not limited to, unauthorized transfers to insiders and equity holders), mismanagement by Debtors' current management is "gross" by any reasonable standard. It is nearly impossible to grasp how the Debtors might offer "adequate protection" of GE's interests, given the Debtors' blatant disregard of those interests for more than fourteen months, the continuing disregard in the First Day Motions and the present conduct of the Debtors' affiliates under the same management.

There is no doubt that economic conditions and the impairment of the KFC brand have diminished, but by no means eliminated, the earning power of the Debtors and Zubair Kazi's whole enterprise. Cash flow misdirected, cash flow not paid over and exacerbating gross mismanagement and financial obfuscation, and intentional opacity demonstrate that promises of

future payment to GE cannot adequately protect GE's interest in existing cash flow and already diverted funds.

## II. ARGUMENT

### A. GE is Entitled to Adequate Protection of its Secured Interests in the Debtors' Collateral During the Pendency of the Cases

GE has a properly perfected security interest in substantially all the Debtors' assets – including, but not limited to, all the Debtors' tangible and intangible personal property.[6] Without limiting the foregoing, GE has properly perfected interests in, among other things, all the Debtors' real property, equipment, accounts receivable, inventory, goodwill, licenses, and contracts, and proceeds thereof. Each of these interests is entitled to adequate protection by the Debtors, and this Court is obligated to condition the Debtors' use of GE's collateral upon the Debtors' provision of adequate protection. *11 U.S.C. § 363(e)* ("on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.").

The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interests, and is grounded in the belief that secured creditors should not be deprived of the benefit of their bargain. *See, e.g., In re Ingle*, 91 B.R. 27, 29 (Bankr. E.D. Mich. 1988) ("the Court recognizes that the protection accorded a secured creditor's property interest in collateral has roots in the Fifth Amendment."); *In re Cambridge Woodbridge Apartments, LLC*, 292 B.R. 832, 841 (Bankr. N.D. Ohio 2003) ("The concept of adequate protection is derived from the Fifth Amendment protection of property interest….[and] reconciles the competing interests of

---

[6] The sole asset class in which the GE may not have a properly perfected security interest as of the Petition Date is in cash accounts held by third-party banks which would not otherwise qualify as "proceeds" of the GE's other property interests.

the debtor, who needs time to reorganize free from harassing creditors, and the secured creditor…who is entitled to constitutional protection for its bargained-for property interest."); *In re Planned Systems, Inc.*, 78 B.R. 852, 861 (Bankr. S.D. Ohio 1987) (same); *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) (same). It is intended to insure that the secured creditor receives the value for which it bargained pre-bankruptcy." *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3rd Cir. 1994); *In re O'Connor*, 808 F.2d 1396 (10th Cir. 1987).

Although the term "adequate protection" is not defined by the Bankruptcy Code, the legislative history related to its enactment makes clear that it was intended to be a flexible concept, with wide discretion available to a bankruptcy court to fashion appropriate relief. *See, e.g.*, H.R. Rep. No. 95-595, (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6295–96. As such, the bankruptcy court is entitled to craft relief and/or condition the Debtors' use of GE's collateral so as to permit GE to realize the "indubitable equivalent" of GE's interests in the collateral. *11 U.S.C. § 361(3)*.

### B. The Adequate Protection Granted to GE Should Protect *All* GE's Security Interests, and not Merely Those on Tangible Property.

GE's blanket liens against the Debtors obligate the Debtors to adequately protect *all* of the GE's security interests, not merely those on tangible property. As such, the Debtors are required to protect, *inter alia*, GE' interests in the Debtor's cash flow, enterprise value and goodwill. *See Warne Invs., Ltd. v. Higgins*, 219 Ariz. 186, 195 P.3d 645 (Ariz. Ct. App. 2008) (including as goodwill, human capital related assets, such as an in-place workforce, skilled and key employees, the going concern premise of a businesses, the existence of excess economic income and the expectation of future events not directly related to current operations); *In re Bay Plastics, Inc.*, 187 B.R. 315, 330 (Bankr. C.D. Cal. 1995) ("Goodwill is generally understood to represent the value of intangible factors that are expected to translate into greater than normal earning power. In addition to the advantageous relationship that a business enjoys with its

- 11 -
11-43971-tjt    Doc 35-2    Filed 02/21/11    Entered 02/21/11 17:24:45    Page 11 of 18

customers, goodwill also includes advantageous relationships with employees, suppliers, lenders and others") (internal citation omitted); *NDB Park Ridge Bank v. SRJ Enterprises, Inc. (In re SRJ Enterprises, Inc.)*, 150 B.R. 933, 940-41 (Bankr. N.D. Ill. 1993) (a secured party with a blanket lien over a debtor's assets has a security interest in the Debtors "goodwill", "going concern value" or, more aptly, "market share value" that existed pre-petition.).

Further, the proceeds of those general intangible assets constitute collateral of the secured lender under Section 552 of the Bankruptcy Code and are also entitled to adequate protection. *Id.*, p. 941 (secured creditor's pre-petition security interest in the debtor's general intangibles, including the debtor's market share value, entitled the secured creditor to a post-petition lien on a termination fee constituting proceeds of that intangible asset); *see also 11 U.S.C. § 552(b); McKinneys Uniform Commercial Code § 9-102* (under New York law, which governs the terms of GE's loan documents with the Debtors, the term "proceeds" includes "whatever is acquired upon the sale, lease, license, exchange or other disposition of collateral" and *also* "whatever is collected on, or distributed on account of, collateral…"). Consequently, because GE has properly-perfected pre-petition security interests in, *inter alia*, the Debtors' equipment, inventory, goodwill, and market share value, GE is entitled to adequate protection of its post-petition security interests in the proceeds, products, offspring, and profits of those pre-petition assets. *Id; see also*, *In re Cafeteria Operators, L.P.*, 299 B.R. 400 (Bankr. N.D. Tex. 2003) (portions of the revenues generated by the post-petition operation of the chapter 11 debtors' restaurants were subject to the secured creditors' pre-petition blanket security interest); *In re Bumper Sales*, *Inc.*, 907 F.2d 1430, 1436-1437 (4th Cir. 1990) (inventory acquired post-petition may still constitute collateral of a secured lender to the extent it is second generation proceeds of

the secured lender, i.e. pre-petition inventory was sold to produce cash, which was used to purchase post-petition inventory)).[7]

### C. GE is Entitled to Adequate Protection to Protect Against the Decline in Value of its Security Interest Over Time.

To ascertain whether a secured lender's interests are adequately protected, the court must determine the value of the secured lender's interest and whether the debtor's proposed use of its property will impair that interest. *In re Megan-Racine Assocs. Inc.*, 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996). "Adequate protection," as used in the Bankruptcy Code, is intended to assure that secured creditor does not suffer a decline in the value of its interests in estate property while the debtor is attempting to reorganize its business operations. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108 S.Ct. 626 (1988). What constitutes adequate protection is a fact-specific inquiry, and must be decided on a case-by-case basis. *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (*citing In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

Here, the scope of the GE's pre-petition blanket security interests dictate that the value of GE's collateral is greatly in excess of the value of a few fryers and the Debtors' general inventory. *11 U.S.C. § 506(a)(1)* (the "value" of a secured party's interest "shall be determined in light of the purpose of the valuation and the proposed disposition or use of such property…."). Thus, because GE has an interest in the Debtors' business as whole, and because the Debtors intend to operate its business as a "going concern" in chapter 11, it follows that the GE's

---

[7] Contrary to the Debtors' assertions in the Cash Collateral Motion, GE has a properly perfected security interest in portions of the Debtors' cash-on-hand as of the Petition Date, and will continue to have a perfected security interest in cash collected post-petition to the extent that it represents proceeds of GE's pre-petition security interests. For instance, as of the Petition Date, GE had a properly perfected security interest in the Debtors' accounts receivable. To the extent those accounts are liquidated post-petition, GE's is entitled to those liquidated amounts. Similarly, at least a portion of every product sold to a customer at the Debtors' restaurant locations are proceeds of the GE's collateral (whether it arises from the inventory, the Debtors' goodwill, or otherwise), and constitute "cash collateral" of GE.

collateral should be valued consistently with the value of the business as a whole. *Id.*

The Debtors' past conduct poses a substantial impediment to the adequate protection of GE's security interests absent the appointment of a chapter 11 trustee or examiner with expanded powers. This conduct includes the Debtors' pattern and practice of:

- comingling assets and/or fraudulently transferring assets between and among their affiliates without regard for corporate formalities;
- making substantial transfers to KMVI for alleged "management fees" despite contractual obligations prohibiting them from doing so;
- removing court-ordered tags placed on personal property repossessed by the Broward County and Miami-Date County Sheriff's office without court authorization;
- failing to comply with court orders directing them to turn over certain financial records to GE and failing to otherwise comply with the audit and access rights granted to GE in the loan documents;
- failing to make payments to GE on account of their secured debt despite having adequate available funds to do so; and
- permitting their Franchise Agreements with KFC Corporation to be terminated, and, at the same time, failing to pursue any other more profitable franchise opportunities.

This conduct compels the conclusion that the Debtors cannot be blindly trusted to adequately protect GE's interests in its collateral. To the contrary, because GE's security interests include liens on cash flow, enterprise value and goodwill and other general intangibles, the fiduciary duty of management to competently and capably fulfill its duties is a fundamental and inexorable element of GE's adequate protection.

By way of example: if management is comprised of known thieves, a secured creditor's interests cannot be adequately protected by placing its collateral in the hands of those thieves, even if it appears that there is a sufficient equity in the collateral at the outset of the case to cover the creditors' interests. A thief cannot be trusted, and so long as the collateral remains in the

possession and control of the thief, the secured creditor will be subjected to that constant risk that its collateral will disappear.

The same is true for grossly incompetent management. Without significant constraints on operation of a debtor's business operations – including, but not limited to, the wholesale prohibition of payments and/or to insiders and affiliates – a secured creditors' collateral is at continual risk of immediate dissipation and cannot be adequately protected. This is especially true where, as here, the Debtors' intangible assets are subject to rapid diminution, and even complete elimination, in a way that tangible assets would rarely be.

For the past fourteen months, the Debtors' management – acting under the direction and control of its shareholder, Zubair Kazi – have continued to make substantial payments to KMVI despite being contractually prohibited from doing so. At the same time, KMVI – again, acting at the behest of Zubair Kazi – has accepted those payments despite being contractually prohibited from doing so. The Debtors' management, has demonstrated that they cannot be trusted to adequately protect GE's collateral. Indeed, the temptation to pay themselves, their affiliates and their insiders – while at the same time making no payments to GE has proven to be too strong to withstand, and, in fact, continues with respect to the non-debtor entities which are co-borrowers from GE and earn even more EBITDA.[8]

This is not a circumstance where GE can be paid on Tuesday (or, at plan confirmation for that matter) for the Debtors' use of its collateral today. The appropriate solution, is that the Debtors' use of GE's collateral must be conditioned upon the Debtors' demonstration that GE's "floating liens" are adequately protected by showing that:

---

[8] GE's motion for the appointment of a receiver for Kazi Foods of New York, Inc. is sub judice and the New York affiliate will doubtless join the Debtors in this Court when such motion is granted.

- 15 -
11-43971-tjt    Doc 35-2    Filed 02/21/11    Entered 02/21/11 17:24:45    Page 15 of 18

> the *level* of such a fluctuating base of items of collateral that are constantly cycling through different shapes and forms, as the business operation continues, will in fact remain at the same magnitude (in terms of on-going operational values) during the relevant period of debtor-in-possession business operation…

*In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D. N.H. 1993).

If the evidence before the court establishes that the soft collateral will sustain a permanent decline, the court will generally require that equity interest holders contribute additional cash to assure the secured lender of adequate protection of its interests. *Id.* at 395. This is consistent with the policy against allowing the debtor to " 'risk other people's money' to salvage their own portfolio." *Id.* (noting that it is "often tempting" for those last in line for payment to "don rose-colored glasses in evaluating the prospects for future operations and reorganization").

Contrary to the Debtors' assertions, replacement liens are inadequate to protect GE since GE already has a perfected security interest in substantially all of the debtor's assets and since EBITDA not paid over (or even escrowed in the short term) will likely not be replaceable. This inherent inadequacy was described by one commentator as follows:

> The quantity and quality of postpetition inventory and receivables cannot be maintained (absent an infusion of capital) if the debtor continues to lose money in the operation of its business. Continuing losses reduce the working capital available to purchase new inventory, and a reduced inventory will cause the accounts to decline. Therefore, if the debtor is likely to continue to lose money, a replacement lien on postpetition inventory and accounts is not (absent substantial equity in the inventory and accounts) a sufficient method of adequate protection.

COMMERCIAL BANKRUPTCY LITIGATION, §5:9 (database updated May 2010) (citing *In re Airwalk Int'l, LLC*, 305 B.R. 34 (Bankr. D. Colo. 2003)).

In the instant case, the Debtors own admissions in the Cash Collateral Motion make clear that their businesses have recently suffered declines. *Cash Collateral Motion*, ¶ 33 (detailing "double digit declines" in sales from 2008 to 2009 for Kazi Florida and "double digit

declines" from 2007 through 2009 for Kazi Michigan). Nothing contained in the Cash Collateral Motion or otherwise compels the conclusion that this decline is subject to reverse itself. To the contrary, to the extent that the Debtors' business revenues mirror those of other KFC operations, the year over year decline in same store sales is likely to continue. As such, the challenge the Debtors' face in demonstrating that the GE is adequately protected merely through replacement liens is insurmountable.

### D. The Court is Prohibited from Authorizing Payments to KMVI.

Without limiting GE's requests for adequate protection, it is fundamental that any mechanism to provideGE with adequate protection of its interests in the Debtors' collateral include a prohibition against payments being made to KMVI for "management fees" or otherwise. As detailed above, the Debtors are contractually prohibited from making such payments, and KMVI is contractually prohibited from receiving them, until such time as GE' claims against the Debtors are satisfied in full. While it is implicit in bankruptcy law that a bankruptcy court has the power to modify a contract between the debtor and a creditor, there is no authority under which this Court can condone payments to a party that is contractually prohibited from receiving them. To the contrary, authorizing those payments to be made would it constitute interference between the contractual dealings of GE and KMVI – two non-debtor parties. A "Bankruptcy Court is not empowered to interfere with a contract between non-debtors because in perceives that carrying out the contract can adversely affect the estate". *First Fidelity Bank, N.A. v. Prime Motor Inns, Inc.* (*In re Prime Motor Inns, Inc.*), 130 B.R. 610, 614 (S.D. Fla. 1991). Indeed, the whole purpose of the subordination agreements was to coercively ensure that KMVI – and not GE – would bear the risk of non-performance by the Debtors.

- 17 -
11-43971-tjt    Doc 35-2    Filed 02/21/11    Entered 02/21/11 17:24:45    Page 17 of 18

## IV. CONCLUSION

For the foregoing reasons, GE's motion should be granted.

Dated: February 21, 2011  
Detroit, Michigan

**PLUNKETT COONEY**

By: /s/ David A. Lerner
David A. Lerner – P44829
Attorneys for GE Entities
38505 Woodward Ave., Suite 2000
Bloomfield Hills, MI 48304
Telephone: (248) 901-4000
Facsimile: (248) 901-4040
dlerner@plunkettcooney.com

-and-

**REED SMITH LLP**

Alexander Terras
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
aterras@reedsmith.com